# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION



United States Courts
Southern District of Texas
FILED

JAN 22 2018

David J. Bradley, Clerk of Court

| | |
|---|---|
| SYSCO CORPORATION,<br><br>          Plaintiff,<br><br>-vs.-<br><br>BUMBLE BEE FOODS, LLC, STARKIST COMPANY, DONGWON INDUSTRIES CO. LTD., DEL MONTE CORPORATION, TRI-UNION SEAFOODS LLC D/B/A CHICKEN OF THE SEA INTERNATIONAL, INC., and THAI UNION GROUP PCL,<br><br>          Defendants. | **REDACTED COMPLAINT**<br><br><br>**Jury Trial Demanded** |

I.    NATURE OF THE ACTION.................................................................................... 1

II.   BACKGROUND .................................................................................................. 2

III.  JURISDICTION AND VENUE............................................................................ 9

IV.   PARTIES............................................................................................................ 10

     A.   Plaintiff ...................................................................................................... 10

     B.   Defendants ................................................................................................. 11

          (i)   Bumble Bee .......................................................................................... 11

          (ii)  The StarKist Defendants ...................................................................... 12

          (iii) The Chicken of the Sea Defendants .................................................... 22

     C.   Other Co-Conspirators and Agents ........................................................... 30

V.    TRADE AND COMMERCE .............................................................................. 30

VI.   THE PRODUCTION OF SHELF-STABLE TUNA............................................ 31

VII.  TUNA SUPPLY, DEMAND AND PRICING...................................................... 33

     A.   The Supply of Canning-Grade Tuna Increased Substantially...................... 33

     B.   The Demand for Shelf-Stable Tuna in the United States Decreased Substantially ........... 34

     C.   Prices Paid for Shelf-Stable Tuna Increased Substantially as a Result of Defendants'
          Conspiracy.................................................................................................. 35

     D.   Defendants' Pricing of Shelf-Stable Tuna to Plaintiff and Others Was Against Defendants'
          Self-Interest But For Their Collusion.......................................................... 38

VIII. THE MARKET FOR THE PRODUCTION AND SALE OF SHELF-STABLE TUNA
      WAS CONDUCIVE TO CARTELIZATION ....................................................... 39

     A.   There Are No Close Substitutes for Shelf-Stable Tuna ................................. 39

     B.   The Market for the Processing and Sale of Shelf-Stable Tuna Is/Was Concentrated ....... 39

C. Barriers to Entry...........................................................................................40

D. Prevailing Supply and Demand Factors Incentivized Collusion .........................41

E. The Movement of Executives Between Defendants Facilitated Collusion ......................41

F. Select Trade Associations Facilitated Collusion.................................................42

G. Common Vendors and Co-Packing Arrangements Facilitated Collusions and Enforcement of the Cartel.........................................................................................................43

IX. ADDITIONAL OVERT ACTS IN DEFENDANTS' SHELF-STABLE TUNA CONSPIRACY .......................................................................................................44

A. Defendants' Collusive Price Increases Between 2004-2006 ...............................44

B. Defendants' Collusive Can Size Reduction and Price Increases in 2007-2008.................51

C. Defendants Collude on Net Prices in 2010 ........................................................58

D. Defendants Colluded to Increase Shelf-Stable Tuna Prices in 2011 .................60

E. Defendants Colluded on a Shelf-Stable Tuna Price Increase in 2012 ...............62

F. Defendants' Collusion Not to Sell "FAD-free" Branded Tuna Products in 2011 and Thereafter ....................................................................................................63

G. Defendants Colluded on Promotional Activity and Pricing Terms in at Least 2011-2013 65

H. Defendants Communications' in Furtherance of the Conspiracy After 2013....................65

I. Defendants' Conspiracy Was Effective ..............................................................66

X. DOJ INVESTIGATION AND AMNESTY APPLICATION..............................................67

XI. DISCOVERY IS NECESSARY TO DETERMINE THE FULL SCOPE OF THE CONSPIRACY ........................................................................................................69

XII. TOLLING/SUSPENSION OF THE STATUTE OF LIMITATIONS...............................69

XIII. ANTITRUST VIOLATIONS ................................................................................81

XIV. PRAYER FOR RELIEF ........................................................................................84

JURY DEMAND ............................................................................................................84

Plaintiff Sysco Corporation ("Plaintiff" or "Sysco"), by and through its undersigned attorneys, files this Complaint against Bumble Bee Foods LLC ("Bumble Bee"), StarKist Company ("StarKist"), Dongwon Industries Co. Ltd. ("Dongwon"), Del Monte Corporation ("Del Monte"), Tri-Union Seafoods LLC d/b/a Chicken of the Sea International, Inc. ("COSI"), and Thai Union Group PCL (f/k/a Thai Union Frozen Products PCL) ("Thai Union" or "TUG") (collectively, the "Defendants").[1] Plaintiff makes its allegations upon knowledge and otherwise upon information and belief, and expects that discovery of information within the custody and control of the Defendants will provide evidence supporting the allegations made upon information and belief.

## I.   NATURE OF THE ACTION

1.   This antitrust action arises out of a conspiracy among Defendants to illegally restrain trade with respect to the sale of shelf-stable tuna (a term which, as used herein, refers to canned and/or pouched tuna).   The Defendants are the three largest producers of packaged seafood products in the United States, collectively accounting for approximately 80 percent of shelf-stable tuna sales.   Defendants agreed to fix, stabilize, maintain, and/or raise the price at which they each sold shelf-stable tuna to Plaintiff and others, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.   The conspiracy began no later than 2004 and continued through approximately July 2015.

2.   The existence of Defendants' antitrust price fixing conspiracy is supported by, among other things, the criminal guilty pleas to date of:   (1) Bumble Bee executive Kenneth

---

[1] As alleged below, Dongwon acquired Starkist in 2008.   Allegations herein regarding the liability of "Defendants" refer, with respect to liability for events prior to Dongwon's acquisition of Starkist in 2008, to all Defendants with the exception of Dongwon, and with respect to liability for events after that date, to all Defendants including Dongwon.

Worsham; (2) Bumble Bee executive Walter Scott Cameron; (3) Defendant Bumble Bee; (4) former StarKist executive Steven L. Hodge; and (5) COSI's admission of anticompetitive conduct and request for amnesty applicant under the Department of Justice's Leniency Guidelines.

3.      Sysco is one of the leading marketers and distributors of food products and food services throughout Texas and the United States.  It purchased shelf stable tuna directly from Defendants and/or their affiliates or agents.  As part of Defendants' unlawful conspiracy, they overcharged Sysco.

4.      Sysco seeks treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and other appropriate relief.

## II.     **BACKGROUND**

5.      After several mergers and acquisitions, by the early 2000s, the shelf-stable packaged seafood industry in the United States operated as an oligopoly dominated by its "Big 3" producers: Bumble Bee, StarKist and COSI. Consumers substitute among different brands of shelf-stable tuna in response to price changes. Shelf-stable tuna possessed the economic characteristics of a commodity-like product with no close substitutes. Indeed, Defendants recognized that if any individual brand were priced above competitor brands, then the high-priced company would lose market share. As a result, no Defendant or its co-conspirators could sustainably profit by unilaterally increasing its prices.

6.      ██████████████████████████████████████████████████
███████████████████████████████████████████ Consumer demand for shelf-stable tuna was dropping and showed no signs of abating. As a result of this decline, Defendants controlled production capacity that substantially exceeded the demand for shelf-stable tuna in the United States.

2

7.      Defendants recognized the challenges posed by market conditions. The solution they embraced in 2004 was to enter into an unlawful agreement to increase prices of shelf-stable tuna sold to Plaintiff and others in the United States by, among other conduct, coordinating price increase announcements or pricing terms, secretly and collusively exchanging pricing information and prospective pricing announcements and business plans, and collectively reducing quantity and restraining output.

8.      █████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

9.      Defendants and co-conspirators maintained this conspiracy over many years through a series of meetings and other communications.

10.     During the early years of the conspiracy, between 2004 and 2006, Defendants and co-conspirators developed a common agreement or understanding that they would follow the price increases that each issued. In furtherance of this common agreement or understanding, Defendants exchanged information on their future pricing plans via telephone and other channels. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████  As a result of these and other collusive price information exchanges,

Defendants were able to and did increase prices of shelf-stable tuna sold to Plaintiff and others in the United States at least twice in 2004 and again in 2006.

11.     In 2007, Del Monte—which operated StarKist—recognized that Defendants could dramatically increase profits if each reduced its tuna can sizes from six ounces to five. 

Consequently, in accordance with their unlawful agreement, Bumble Bee, COSI and StarKist collusively downsized their six-ounce tuna cans to five ounces, while also colluding to raise prices on the newly downsized cans.

12.     Other collusive shelf-stable tuna price increases by the Defendants ensued. In furtherance of their continuing unlawful agreement, Defendants implemented collusive price increases on shelf-stable tuna in at least 2008, 2010, 2011, and 2012. Additionally, in at least 2011, 2012 and 2013, Defendants agreed to refrain from discounting and promotional practices and terms of sale of packaged tuna to customers, which affected the prices Sysco paid for packaged tuna. Further, in 2012, Defendants and their co-conspirators agreed not to sell under their own brands any shelf-stable tuna products containing tuna caught with the use of a Fish Aggregating Device. Upon information and belief, this agreement remained in effect at least until July 2015.

13.     As explained below, the conspiracy was facilitated in part by the fact that during the relevant period, numerous executives and other employees left the employ of one Defendant to work for another. This helped cultivate a culture of collusion in the packaged seafood industry. Certain industry trade associations also facilitated the conspiracy by providing Defendants with cover to meet and conduct conspiracy business. And Defendants' use of a common vendor for their cans (Impress, a co-conspirator) and a co-packing arrangement between Bumble Bee and COSI also facilitated Defendants' collusion and enforcement of their cartel.

14.     As far back as 2004, Defendants and co-conspirators affirmatively and fraudulently concealed their unlawful conduct and coordinated their messaging to their customers to propound pretextual justifications for their collusive price increases. These pretextual explanations by Defendants for their shelf-stable tuna price increases were intended to create the illusion that the market for shelf-stable tuna in the United States was competitive when it was not. But Plaintiff did not know this at the time. As a result of their many affirmative and fraudulent acts of concealment, described with particularity below, Defendants prevented Plaintiff from learning about the existence of the conspiracy until July 2015, when Thai Union admitted publicly that the DOJ was investigating the packaged seafood industry in the United States.

15.     The conspiracy alleged in this Complaint was continuous and overarching. Defendants and non-defendant co-conspirators had one or more common objectives in the conspiracy, which they realized, including, fixing, stabilizing,  maintaining, and/or raising the price of shelf-stable tuna sold to Plaintiff and others. There was an interdependence among the

Defendants and co-conspirators regarding the overt acts alleged below to achieve the objectives over the course of the conspiracy period.

16.     In the paragraphs below, Plaintiff identifies who communicated with whom, when, where (when they met in person) and what they agreed to or discussed in furtherance of the conspiracy alleged in this Complaint. These communications included in-person meetings, emails, and telephone calls, and they involved the top executives from each Defendant. A list of the conspiracy's players, the company for each individual conspirator worked, and their titles is attached as Appendix A.

17.     That the shelf-stable tuna conspiracy existed cannot credibly be doubted. On January 25 and March 15, 2017, Bumble Bee executives Walter Scott Cameron and Kenneth Worsham, respectively, pleaded guilty to the felony charge of violating the U.S. antitrust laws by participating in an unlawful "conspiracy to suppress and eliminate competition by reaching agreements to fix, stabilize, maintain, and/or raise the prices of packaged seafood sold in the United States from at least 2011 through at least 2013 in violation of the Sherman Antitrust Act, 15 U.S.C. §1." The plea agreements both state that "[p]ackaged seafood includes shelf-stable tuna fish." They further state that during the relevant period, Cameron and Worsham participated in a conspiracy with other persons and entities engaged in the manufacture and sale of packaged seafood, the primary purpose of which was to fix, stabilize, maintain, and/or raise the prices of packaged seafood sold in the United States. In furtherance of the conspiracy, [Cameron and Worsham each] engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood-producing firms. During these conversations, discussions and meetings, agreements and mutual understandings were reached to fix, stabilize, maintain, and/or raise the prices of packaged seafood sold in the United States."

18.     Additionally, on August 2, 2017, Bumble Bee pleaded guilty to price-fixing shelf-stable tuna products in the United States between 2011 and 2013. Bumble Bee will pay at least a $25,000,000 criminal fine for its criminal conduct. Acting Assistant Attorney General Andrew Finch commented when announcing the plea agreement that DOJ's Antitrust Division, "along with our law enforcement colleagues, will continue to hold these companies and their executives accountable for conduct that targeted a staple in American households."

19.     Then, on June 28, 2017, Stephen L. Hodge, a former Senior Vice President of Sales at StarKist, pleaded guilty for his role in a conspiracy to fix the price of packaged seafood, from as early as 2011 through 2013. Acting Assistant Attorney General Andrew Finch commented that DOJ's Antitrust Division, "along with our law enforcement colleagues, will continue to investigate price fixing among packaged seafood companies and the executives who worked at those companies."

20.     The Cameron, Worsham, Hodge, and Bumble Bee guilty pleas establish that a conspiracy *did* exist. But a guilty plea merely establishes the minimum parameters of a conspiracy. *See, e.g., In re Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1475705, at *11 (D.D.C. May 9, 2000) ([T]he Court rejects the notion that the guilty pleas . . . foreclose a broader conspiracy. Guilty pleas are negotiated instruments which take into account not only the culpability of the accused but the Justice Department's resources and other cases requiring the government's attention."). Thus, the scope of the conspiracy actionable in a civil antitrust action—including the timing of, and products and participants in, the conspiracy—may be (and as alleged in this Complaint is) broader than the related criminal convictions. Discovery is necessary to determine the full scope of the conspiracy in terms of products, time period, and participants.

21.     Another reason that the existence of this conspiracy cannot credibly be doubted is that COSI has confirmed it is the amnesty applicant in this case. Under the DOJ Leniency Guidelines, for COSI to receive conditional amnesty, the company itself had to admit to a criminal violation of the U.S. antitrust laws involving, among other conduct, price fixing. *See* www.justice.govc/atr.frequently-asked-questions-regarding-antitrust-divisions-leniency-program.

22.     The existence of the shelf-stable tuna conspiracy alleged in this Complaint is further supported by additional evidence alleged below, including, without limitation, the following:

(a)     On December 3, 2015, Thai Union and Bumble Bee announced they had abandoned their proposed merger in the face of DOJ's criminal investigation of them, prompting William Baer, then head of the DOJ's Antitrust Division, to state later that day that "[the DOJ's] investigation convinced us—and the parties knew or should have known from the get go—that the market is not functioning competitively today, and further consolidation would only make things worse."

(b)     During periods relevant to Plaintiff's claims, the market for the production and sale of shelf-stable tuna was conducive to cartelization because: (i) shelf-stable tuna is a commodity-like product for which there are no close substitutes; (ii) Defendants dominated the market for the processing of tuna and the production and sale of shelf-stable tuna in the United States; and (iii) there were barriers to entry into the market for the production and sale of shelf-stable tuna in the United States.

8

III.   **JURISDICTION AND VENUE**

23.     This civil antitrust action arises under Section 1 of the Sherman Act, 15 U.S.C. §

1, for costs of the suit and treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. §

15(a).

24.     This Court has subject matter jurisdiction over each claim in this action pursuant

to 28 U.S.C. §§ 1331 and 1337 and Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

25.     Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton

Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391, because during the Relevant Period, one or

more Defendants transacted business in, was found in, and/or had agents within this District, and

a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion

of the affected interstate trade and commerce described below has been carried out in this

District.

26.     The Court has personal jurisdiction over each Defendant because each Defendant

transacted business in this District, directly or indirectly sold packaged seafood products to

Plaintiff in this District, has substantial contacts with this District, and engaged in the alleged

price fixing conspiracy directed to purchasers of packaged seafood product in this District,

including Plaintiff.

27.     In addition to the foregoing, or in the alternative, TUG[2] and Dongwon[3] have each

consented to or waived objection to this Court's personal jurisdiction over each of them in this

case.

_____

[2] TUG sponsors American Depository Receipts, which are traded on NASDAQ, which will
allow U.S. investors to trade equities of TUG in the United States securities market. In

## IV.   PARTIES

### A.   Plaintiff

28.     Plaintiff Sysco Corporation is a Delaware corporation with its principal place of business in Houston, Texas.  Sysco is one of the leading marketers and distributors of food products and food services throughout Texas and the United States.  From 2004 through 2015, Sysco purchased hundreds of millions of dollars' worth of shelf-stable tuna at artificially inflated prices directly from various Defendants, and/or their affiliates or agents, and suffered injury to its business or property as a direct or proximate result of Defendants' wrongful conduct.

---

connection with those U.S. securities transactions, TUG regularly files and discloses required financial information with the U.S. Securities and Exchange Commission.

[3] Moreover, Dongwon has availed itself of the personal jurisdiction of courts in the United States and U.S. territories, and maintained that it is the alter ego of its wholly-owned subsidiary (StarKist) doing business in U.S. territories. For example: (i) In *Dongwon Industries Co., Ltd., v. Ships Gear & Transit, Inc.*, 93-cv-01691 (S.D. Cal.), Dongwon submitted to the personal jurisdiction of the Southern District of California by commencing an action for breach of contract and tort claims against a ship manufacturer from which Dongwon purchased three purse-seining vessels for tuna fishing; (ii) In *Dongwon Industries Co., Ltd, v. Yoshida*, 90-cv-00282 (D. Alaska), Dongwon availed itself of the jurisdiction of the U.S. courts by commencing an action in the District of Alaska; (iii) In *Hill v. Majestic Blue Fisheries, LLC*, 10-cv-23886 (S.D. Fla.), and *In the Matter of Majestic Blue Fisheries, LLC*, 11-cv-00032 (D. Guam), Dongwon consented to the jurisdiction of the courts in actions arising out of the sinking of a U.S. flagged vessel operated and managed by Dongwon; (iv) In *Yu Sheng Fishery Co., Ltd., v. Dongwon Industries Co., Ltd.*, 1991 WL 126138 (D. Guam), the District Court found that Dongwon had satisfied the requirements of in persona jurisdiction based on Dongwon's assertions that it had sufficient minimum contacts with Guam and was the alter-ego of its cannery located in Guam; (v) In *Yang et al v. Majestic Blue Fisheries, LLC*, et al., 13-cv-00015 (D. Guam), Dongwon maintained that as the agent of a U.S.-flagged vessel, it (Dongwon) was the beneficiary of and had right to enforce an arbitration provision in a seaman's contract, and Dongwon was entitled to enforce the arbitration provision because its conduct was substantially interdependent and arose out of the same misconduct attributable to the U.S. vessel owner; and (vi) In *United States of America ex rel. Moore & Co. v. Majestic Blue Fisheries LLC, et al.*, 12-cv-01562 (D. Del.), litigation arose from Dongwon's scheme (along with relatives of company insiders) to form U.S. corporations for the purpose of acquiring two fishing vessels flagged under U.S. law and certified as such under the South Pacific Tuna Treaty.

29.     Sysco is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15, U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26.

**B.     Defendants**

(i)     Bumble Bee

30.     Defendant Bumble Bee Foods LLC is a Delaware limited liability company, with its headquarters and principal place of business in San Diego, California. During the period relevant to Plaintiff's claims, Bumble Bee manufactured and sold shelf-stable tuna. Bumble Bee is defined to include its managers, officers, employees, and agents acting on its behalf. Bumble Bee maintains shelf-stable tuna processing facilities in San Diego, California, and it maintained a plant in Puerto Rico that it closed in approximately June 2012. Bumble Bee's 2014 annual revenue exceeded $1 billion. Bumble Bee is owned by Lion Capital LLP ("Lion Capital"), a private equity firm based in the United Kingdom. Lion Capital purchased Bumble Bee in 2010 for approximately $980 million from Centre Partners Management LLC, a U.S.-based private equity firm. In 2014, Lion Capital agreed to sell Bumble Bee to Thai Union for $1.51 billion. However, due to concerns about the antitrust violations alleged in this Complaint, Lion Capital and Thai Union announced on December 3, 2015, that they were not proceeding with the merger.[4]

31.     Bumble Bee directly participated in the conspiracy alleged in this Complaint. During the period relevant to Plaintiff's claims, Bumble Bee produced and sold shelf-stable tuna throughout the United States and its territories; Bumble Bee directly sold shelf-stable tuna to

---

[4] *See* https://www.law360.com/competition/articles/734219/bumble-bee-thai-co-drop-1-5b-tuna-tieup-over-doj-fears.

11

Plaintiff and others in the United States; and Bumble Bee engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

       (ii)    <u>The StarKist Defendants</u>

32.     Defendant StarKist Company is a corporation organized, existing, and doing business under the laws of the State of Pennsylvania, with its headquarters and principal place of business in Pittsburgh, Pennsylvania. During the period relevant to Plaintiff's claims, StarKist manufactured and sold shelf-stable tuna. StarKist is defined to include its officers, employees, and agents acting on its behalf. StarKist operates its tuna processing facility in Pago Pago, American Samoa. Although StarKist's annual revenue is not publicly reported, the Pittsburgh Post-Gazette reported in early 2010 that StarKist's annual revenue was between $650 and $670 million. In 2008, Dongwon Industries Co. Ltd. ("Dongwon") purchased StarKist for approximately $363 million and thereafter, including during the period relevant to these allegations, StarKist operated as a wholly-owned subsidiary of Dongwon. During the period relevant to Plaintiff's claims, StarKist directly or on behalf of Dongwon: participated in the conspiracy alleged in this Complaint; produced and sold shelf-stable tuna throughout the United States and its territories; sold shelf-stable tuna to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

33.     Defendant Dongwon Industries Co. Ltd. is a corporation organized, existing, and doing business in South Korea, with its headquarters located in Seoul, South Korea. Dongwon is a vertically integrated fishing conglomerate that owns the world's largest fishing fleet. Dongwon has an ownership stake in U.S. businesses besides StarKist, including a 12.5% stake in Silver Bay Seafoods, LLC (a fishery in Sitka, Alaska) and a 50% majority interest in DW Global, Inc. (a shipping and import/export company located in Commerce, California). As noted above, in

2008, Dongwon bought StarKist, and Dongwon is StarKist's parent. Dongwon sells a substantial volume of shelf-stable tuna (and other shelf-stable packaged seafood products) in the United States, and according to its quarterly and annual reports, it typically derives more than 50% of its global revenue from the United States.

34.     Dongwon Industries is a Korean "chaebol." *See generally* David Hundt, Korea's Developmental Alliance: State, Capital and the Politics of Rapid Development (2009); R. M. Steers, K.S. Yoo, & G. Ungson, The Chaebol: Korea's New Industrial Might (1989). The term chaebol is made up of the words "chae" (wealth or property) and "bol" (clan or group). Chaebols are closely-knit business groups in South Korea under the control of a single family or extended family, with key flagship firms that are used as the instruments of control of other firms within the group. They have four key features: (1) the governance structure of the group involves family or extended family control; (2) the formal organizational structure of the group involves a group headquarters, located in an actual or de facto holding company, sometimes known as a "flagship" company, which controls a network of subsidiaries, which fall under the control of the family, the group as a whole, and of flagship firms within the group; (3) the business structure of the firm encompasses a number of discrete products and services, some of which are wholly unrelated and others that are effectively vertically integrated; and (4) these groups are characterized by strong internal cultures of hierarchy, familism and loyalty, with family members of the founder or his cohorts also occupying key managerial positions within the group.

35.     The Dongwon family of companies fits this definition. The company was founded in 1969 and is dominated by Chairman Jae-chul Kim ("Chairman Kim") and members of his family, as described in more detail below. The group headquarters is in Seoul, South Korea, where its holding company, Dongwon Enterprises, is located. Through its subsidiaries, Dongwon

operates in a number of business sectors including, *inter alia*, marine products, other food products, feed products and pet food, packing materials, and aluminum foil products. Defendants Dongwon and StarKist exhibit an internal culture of hierarchy and familism, with members of J.C. Kim's family being put in key positions in both companies and executives at Dongwon, Dongwon Enterprises, and various other Dongwon subsidiaries being routinely seconded to StarKist to fill managerial roles. Dongwon, run by Chairman Kim, is the parent entity for StarKist, but Chairman Kim's control over the Dongwon family of companies was such that, under his broad authority, he could (and in fact did) command executives of the holding company or from sister subsidiary companies to either oversee the business of StarKist from Korea or relocate in the United States and help run StarKist. This was done without regard for which Dongwon subsidiary the individual worked for, and for the purposes of involvement in StarKist's management, all Dongwon personnel were functionally Dongwon Industries personnel subject to the direct control of Chairman Kim. In other words, Dongwon does not follow the principles of corporate separateness that are expected of companies incorporated in the United States and instead acts as a single integrated enterprise. Accordingly, acts taken by employees of Dongwon's corporate affiliates in furtherance of the conspiracy, as alleged in detail below, were taken on behalf of the interests of the chaebol and under the control of Dongwon (and Chairman Kim) as the chaebol's flagship.

36.     From the time of its acquisition of StarKist onward, Dongwon directly participated in the conspiracy alleged in this Complaint and purposefully directed this conduct at the United States (including California and Texas); produced and sold shelf-stable tuna in the United States and its territories; intentionally sold shelf-stable tuna priced at supracompetitive levels to Plaintiff and others in the United States; used its dominance or control of StarKist's raw

material purchasing and tuna business to conspire with the other Defendants and their co-conspirators; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

37.     Alternatively, from the time of its acquisition of StarKist onward, and as more fully alleged throughout this Complaint, Dongwon participated in the conspiracy by and through StarKist, which acted as Dongwon's alter ego or agent. Dongwon dominated or controlled StarKist's shelf-stable tuna business as reflected by, among other actions, Dongwon's domination or control of StarKist's production, pricing, hiring, budgeting, capitalization and/or marketing of shelf-stable tuna. During this time period, Dongwon effectively controlled and took over performance of the day-to-day operations of StarKist's shelf-stable tuna business, and there was such unity of interest and ownership between Dongwon and StarKist that the individuality or separateness of the two companies ceased with respect to StarKist's shelf-stable tuna business. StarKist's status as the alter ego or agent of Dongwon is evidenced by, among other facts, one or more of the facts alleged below that occurred during the period relevant to Plaintiff's claims:

(a)     Dongwon used StarKist as a shell, instrumentality, or conduit for a single venture involving the sale of shelf-stable tuna priced at supracompetitive levels in the United States which was caught, processed, and/or packaged by Dongwon in South Korea and Thailand for the ultimate benefit of Dongwon and the Kim family. ████████████████ ████████████████████████████████████ ███████████████████ Dongwon used StarKist to market Dongwon's product. StarKist enabled Dongwon to be vertically integrated with respect to the U.S. operations. As a result of this vertical integration, Dongwon and StarKist effectively functioned as a single entity for purposes of the conspiracy. With respect to the shelf-stable tuna produced by Dongwon in

South Korea and Thailand and sold in the United States, StarKist acted as Dongwon's marketing conduit to sell Dongwon's shelf-stable tuna under the Dongwon-owned StarKist label.

(b)     Dongwon dominated or controlled StarKist's marketing of shelf-stable tuna in the United States. For example, Dongwon's website states: "StarKist is an iconic tuna brand in the United States, *and has been controlled by Dongwon Group since 2008*, accompanying Dongwon Group on its journey to globalization . . . . Through the acquisition of StarKist, Dongwon Group has secured an opportunity to take off as the world's biggest tuna company, and will become de facto a globalized enterprise." (Emphasis added.) Dongwon has presented a common global marketing image with StarKist. As Dongwon stated in 2008, it acquired StarKist to "establish a strong foothold in penetrating the U.S. market," and the purpose of Dongwon's acquisition was "to add a stable buyer of its tuna and to place other products in the U.S. through StarKist's distribution network." Dongwon and StarKist presented themselves to Plaintiff as a single, vertically integrated entity. StarKist's website states that "Dongwon Industries is one of the world's largest tuna catching companies with a fleet of 36 boats. Dongwon's world class fish procurement and processing capacity builds on StarKist's national brand recognition and distribution networks in the United States to bring world-class seafood to consumers worldwide."[5]

(c)     Dongwon and StarKist used the same offices or locations in the United States. Dongwon's website lists StarKist's U.S. office as one of its global branch offices.

(d)     Dongwon and StarKist had overlapping Board Members and key executives who dominated or controlled StarKist. For example, in about September 2014,

---

[5] *See* http://starkist.com/about-starkist.

Andrew Choe ("A. Choe") became the President and CEO of StarKist. A. Choe was seconded to StarKist in April 2012 as the Senior Vice-President of its supply chain. Previously, Mr. Choe had held an executive position at Dongwon as Director of Strategic Planning. Nam-Jung Kim ("NJ Kim"), son of Chairman Kim, served as the COO of StarKist from about 2012 until October 2014, when he was promoted to Vice Chairman of StarKist. He currently serves on the board of directors for StarKist and Dongwon.[6] Before being sent to join StarKist, NJ Kim was Vice-President of Dongwon F&B (a Dongwon subsidiary) and Dongwon Enterprise Co. (the Kim family's holding company that owns Dongwon Industries). Since 2008, NJ Kim has served as the Head of the Finance and Planning Department at Dongwon Systems and served as Vice President of its construction unit. Additionally, according to Forbes, in preparation for Chairman Kim's succession, "the founder has been transferring ownership of the private family holding company, Dongwon Enterprise Co., which owns stakes in [Dongwon and other affiliates], to Nam-Jung. Jae-Chul holds a 24.5% stake and Nam-Jung, 68%." Accordingly, NJ Kim owned a controlling interest in Dongwon while serving as StarKist's COO and Vice Chairman. The position of COO was created specifically for him, so that he could lead the "continued growth and expansion of Dongwon-StarKist global business." Also, Hyung-Joo Kim, Chief Financial Officer ("CFO") of Dongwon F&B, was seconded to StarKist in 2012 to serve as CFO. In-Gu Park ("IG Park"), the Chairman of the Board of StarKist, also served as its Acting President from November 2010 to March 2011. IG Park serves as CEO of Dongwon Precision Machinery Company, and has also served as CEO and Vice Chairman at Dongwon F&B and Dongwon Enterprise. During time periods relevant to these allegations, IG Park chaired StarKist's board of

---

[6] *See* http://www.4-traders.com/business-leaders/Nam-Jung-Kim-066XMH-E/biography/.

directors while simultaneously sitting on the board or serving as an officer (or both) of other Dongwon companies. Additionally, StarKist's board meetings were often held in South Korea so that Dongwon executives could easily attend them.

(e)     Dongwon appointed people who were involved in the day-to-day operations of StarKist, including people who participated in the conspiracy. For instance, Dongwon appointed senior executives at StarKist—including at least In-Soo Cho (IS Cho), A. Choe and Sam Lee. Additionally, Dongwon dismissed several StarKist executives in 2012 and replaced them with employees from within the Dongwon corporate family, including Hyung-Joo Kim as CFO. After Dongwon's acquisition of StarKist, American executives at StarKist Company began to leave—voluntarily and involuntarily. One report indicated that a "plethora of executives from Dongwon Industries' Seoul headquarters[,] complete with translators" had "descend[ed] on Pittsburgh to sort out the 'challenges' the company is going through"; one source stated that "there is so much American management leaving and probably even more so after this announcement . . . ."

(f)     Dongwon micromanaged StarKist's affairs and disregarded principles of corporate separateness with respect to StarKist. For example: ██████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████





     (g)     Dongwon, as the parent, owned StarKist, the wholly owned subsidiary of Dongwon. Dongwon purchased 100% of StarKist in 2008.

(h)     Due to the unlawful conduct alleged in this Complaint, StarKist earned profits in excess of what it would have earned in a competitive market. ██████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Accordingly, Dongwon knowingly profited from StarKist's participation in the conspiracy and knowingly accepted the proceeds of the conspiracy and has been unjustly enriched. As a result of these facts, considered alone or in combination with one or more of the foregoing other facts, adherence to the fiction of the separate existence of Dongwon and StarKist would sanction a fraud or promote an injustice, and an inequitable result or an injustice would occur if the corporate form were elevated over substance.

38.     Del Monte Corporation ("Del Monte"), now known as Big Heart Pet Brands, Inc., is a privately held corporation organized under the laws of Delaware with its headquarters and principal place of business in Orrville, Ohio. Before October 2008, Del Monte owned and operated StarKist. Although Del Monte sold StarKist to Dongwon in 2008, it continued to assist with the operation StarKist on behalf of Dongwon until approximately September 2010, under an Operating Services Agreement entered into between Del Monte and Dongwon pursuant to which Del Monte provided the sales force that sold StarKist products in the United States. In a filing with the Securities & Exchange Commission, Del Monte explained that under the Operating Services Agreement with Dongwon, Del Monte provided operational services to StarKist such as "warehousing, distribution, transportation, sales, information technology and administration."

39.     Del Monte participated directly in the conspiracy. As alleged in this Complaint, Del Monte employees including, ██████████████████████████████████ ████████████████████—attended meetings and engaged in other overt acts in furtherance of the conspiracy on behalf of StarKist and Del Monte. Additionally, during the period relevant to Plaintiff's claims, Del Monte sold StarKist-branded shelf-stable tuna at prices affected by the conspiracy directly to Plaintiff and others in the United States, in violation of Section 1 the Sherman Act.

40.     For the period before October 2008, the term "StarKist Defendants" refers to StarKist and Del Monte, collectively. For the period from October 2008 until October 2010, the term "StarKist Defendants" refers to StarKist, Del Monte, and Dongwon, collectively. And for the period from November 2010 until July 2015, the term "StarKist Defendants" refers to StarKist and Dongwon, collectively.

(iii)     The Chicken of the Sea Defendants

41.     Defendant Tri-Union Seafoods LLC, doing business as Chicken of the Sea International, Inc., is a limited liability company organized, existing and doing business under the laws of the State of California, with its headquarters and principal place of business in San Diego, California. COSI is defined to include its managers, officers, employees and agents acting on its behalf. COSI operates its tuna processing facility in Lyons, Georgia. In 1997, Tri-Union Seafoods LLC acquired COSI (which was then called Van Camp Seafood Company), with Thai Union Group PCL (f/k/a Thai Union Frozen Products PCL) owning a 50% ownership interest in the limited liability company. In 2000, TUG acquired the remaining 50% share of Tri-Union Seafoods LLC, and COSI became a wholly owned subsidiary of TUG (and has remained a TUG subsidiary ever since). In 2014, TUG earned gross profit of $547 million on worldwide revenue of $3.34 billion. COSI directly, or on behalf of TUG participated in the conspiracy alleged in this

Complaint.  During the period relevant to Plaintiff's claims,  COSI also directly, or on behalf of TUG, produced and sold shelf-stable tuna throughout the United States and its territories; sold shelf-stable tuna to Plaintiff and others in the United States; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

42.     COSI has admitted to violations of Section 1 of the Sherman Act, having sought "amnesty" for cooperation with the Department of Justice.  And as part of its request for criminal amnesty and participation in the DOJ's leniency program, it may seek limitations on civil liability afforded to amnesty applicants under Public Law 108-237, Title II, Subtitle A ("Antitrust Enforcement Enhancements and Cooperation Incentives").

43.     COSI, however, is only entitled to the provisions of that law limiting its civil liability to the extent that it "has provided satisfactory cooperation to the claimant with respect to the civil action."  That mandatory cooperation includes "providing a full account to the claimant of all facts known to the applicant or cooperating individual, as the case may be, that are potentially relevant to the civil action"; "furnishing all documents or other items potentially relevant to the civil action that are in the possession, custody, or control of the applicant or cooperating individual, as the case may be, wherever they are located"; and "using its best efforts to secure and facilitate from cooperating individuals covered by the agreement" interviews, depositions, or testimony in connection with the civil action in which the cooperating witnesses must respond "completely and truthfully, without making any attempt either falsely to protect or falsely to implicate any person or entity, and without intentionally withholding any potentially relevant information," to all questions asked by the civil plaintiff.

44.     Moreover, COSI is only entitled the protections of the DOJ amnesty program for the conspiratorial actions for which it accepts responsibility. Plaintiff alleges a conspiracy from

2004 through 2015. To the extent that Plaintiffs proves a conspiracy broader than that for which COSI obtains leniency, then COSI will face treble damages and joint and several liability for its misconduct that goes beyond that to which it has admitted guilt as part of its participation in the amnesty program.

45.     In addition, DOJ's model corporate conditional leniency letter requires applicants to "pay restitution to any person or entity injured as a result of the anticompetitive activity being reported" in order to benefit from the amnesty afforded by the leniency program. Thus, assuming the DOJ's leniency agreement with COSI has taken its typical form, COSI will be required to make a full and satisfactory payment of restitution to Plaintiff in order to benefit from the limitations on liability potentially afforded by ACPERA.

46.     Defendant Thai Union Group PCL is a corporation organized, existing and doing business in Thailand, with its headquarters located in Amphar Muang, Thailand. After its acquisition, COSI became a wholly-owned subsidiary of TUG.

47.     TUG directly participated in the conspiracy and purposefully directed this conduct at the United States (including Texas and California). During the period relevant to Plaintiff's claims, TUG produced and sold shelf-stable tuna in the United States and its territories; sold shelf-stable tuna to Plaintiff and others in the United States; used its dominance or control of COSI's raw material purchasing and tuna business to conspire with the other Defendants and their co-conspirators; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act. █████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████ Cheng is
Kraisorn Chansiri's brother and the second largest shareholder of Thai Union.

48.     Alternatively, as more fully alleged throughout this Complaint, Thai Union participated in the conspiracy by and through COSI, which acted as and was Thai Union's alter ego or agent. During the period relevant to Plaintiff's claims, Thai Union dominated or controlled COSI's shelf-stable tuna business as reflected by, among other actions, Thai Union's domination or control of COSI's production, pricing, hiring, budgeting, capitalization and/or marketing of shelf-stable tuna. During this time period, Thai Union effectively controlled and took over performance of the day-to-day operations of COSI's shelf-stable tuna business, and there was such unity of interest and ownership between Thai Union and COSI that the individuality or separateness of the two companies ceased with respect to COSI's shelf-stable tuna business. COSI's status as the alter ego or agent of Thai Union is evidenced by, among other facts, one or more of the facts alleged below that occurred during the period relevant to Plaintiff's claims:

(a)     Thai Union used COSI as a shell, instrumentality, or conduit for a single venture involving the sale of shelf-stable tuna priced at supracompetitive levels in the United States which was caught, processed and canned or pouched by Thai Union in Thailand for the ultimate benefit of Thai Union. COSI enabled Thai Union to be vertically integrated with respect to the U.S. operations. As a result of this structure, Thai Union and COSI effectively functioned as a single entity for purposes of the conspiracy. In the words of Thai Union, COSI and Thai Union were not just "family," but "Thai Union + COSI = One Company." With respect to the

shelf-stable tuna produced by Thai Union in Thailand and sold in the United States, COSI acted as Thai Union's marketing conduit to sell Thai Union's shelf-stable tuna under the Thai Union-owned COSI label.

(b)     Thai Union dominated or controlled COSI's marketing of shelf-stable tuna in the United States. For example, TUG presented (and does present) a common global marketing image with COSI. TUG's 2015 Annual Report lists COSI as "our strong brand in North America." TUG's 2001 Annual report states: "The principal activities of the overseas subsidiaries such as the subsidiaries in United States are the manufacture and distribution of canned seafood, and the import of shrimp and other frozen seafood products for sale to restaurant chains, retailing, wholesaling and food processing."

(c)     Thai Union and COSI used the same offices or locations in the United States. TUG's 2015 Annual Report, identifying "Thai Union's footprint," lists itself as having corporate offices in Portsmouth, New Hampshire; New York, New York; El Segundo, California; San Diego, California; and Lyons, Georgia. Each of these offices is an office or plant of COSI.

(d)     Thai Union and COSI had overlapping Board Members and key executives who dominated or controlled COSI. For example, according to a corporate organizational chart on its website, TUG represents that it treats COSI as part of its overall "Global Tuna Business" and "US Ambient Operations" that are controlled directly by TUG's Board of Directors and executives. Kraisorn Chansiri, the Chairman of TUG, is a member of the Board of Directors of COSI; Cheng Niruttinanon ("C. Niruttinanon"), Executive Chairman of TUG, is a member of COSI's Board of Directors; and Thiraphong Chansiri ("T. Chansiri"), President and CEO of TUG, is a member of COSI's Board of Directors and President of Thai

26

Union North America, Inc., a wholly-owned subsidiary of TUG and the holding company through which TUG owns COSI and does business in the United States. Additionally, Shue Wing Chan ("Chan"), a member of the family that controls TUG, and a member of TUG's self-styled "Global Leadership Team," is President and CEO of COSI. David Roszmann, the former Chief Operating Officer of COSI, joined COSI in March 2013 and directly reported to CEO Chan on matters including sales, marketing, procurement, supply chain, operations, finance, HR, legal and IT. Mr. Roszmann left COSI in December 2015, soon after the DOJ questioned TUG's attempt to acquire Bumble Bee. Upon information and belief, Chan now holds executive positions at COSI and other subsidiaries controlled by TUG. Further, Chang Tim King served as Executive Director and CFO of TUG and a member of the COSI Board of Directors.

      (e)    Thai Union appointed people who were involved in the day-to-day operations of COSI, including people who participated in the conspiracy as Thai Union intended.

      (f)    Thai Union micromanaged COSI's affairs and disregarded principles of corporate separateness with respect to COSI.



(g)     Thai Union, as the parent, owned COSI, the wholly owned subsidiary of Thai Union.

(h)     Due to the unlawful conduct alleged in this Complaint, COSI earned profits in excess of what it would have earned in a competitive market. COSI transferred this ill-gotten gain to its parent, Thai Union, by paying out the unlawfully obtained profits and other conspiracy proceeds to Thai Union in the form of dividends and other transfer payments. ███

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ Accordingly, Thai Union knowingly profited from COSI's participation in the conspiracy and knowingly accepted the proceeds of the conspiracy and has been unjustly enriched. Further, TUG charged COSI prices for tuna that were higher than COSI would have paid had COSI been free to acquire tuna at market rates. As a result of these facts, considered alone or in combination with one or more of the foregoing other facts, adherence to the fiction of the separate existence of Thai Union and COSI would sanction a fraud or promote an injustice, and an inequitable result or an injustice would occur if the corporate form were elevated over substance.

49.     Although COSI is the amnesty applicant as part of the DOJ's leniency program, Thai Union has made no such application.  On the contrary, in a September 2017 press release, Thai Union acknowledged COSI's leniency application and asserted that "Thai Union was not involved in the conduct for which Tri-Union has received conditional leniency." Thai Union has thus made it clear that it is not seeking amnesty and cannot benefit from any of the limitation on

liability protections that may be afforded to COSI if COSI fully complies with all of its obligations as a leniency applicant.

50.     Tri-Union Seafoods LLC d/b/a Chicken of the Sea International, Inc., and Thai Union Group PCL, are collectively referred to in this Complaint as the "COSI Defendants."

## C.     Other Co-Conspirators and Agents

51.     Other entities and individuals not named as Defendants combined, conspired, or agreed with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Complaint. Conspirators currently known to Plaintiff include Impress USA, Inc. ("Impress") and its employees.

52.     The individuals employed by Defendants and co-conspirators who participated in the conspiracy did so on behalf of their respective employer Defendant or co-conspirator, and their conduct in furtherance of the conspiracy was undertaken by each of them during the course and scope of their employment by their Defendant employer or co-conspirator.

## V.     TRADE AND COMMERCE

53.     During the period relevant to Plaintiff's claims, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate or foreign commerce, and the effect of that business on interstate or foreign commerce is substantial. In particular, the activities of Defendants and their co-conspirators are within the flow of interstate and foreign commerce or have a substantial effect upon interstate or foreign commerce in that:

(a)     Defendants and their co-conspirators sold and shipped substantial quantities of shelf-stable tuna in a continuous and uninterrupted flow in interstate commerce to customers located in States other than the States in which the Defendants and their co-conspirators produced the shelf-stable tuna;

(b)     Data, information, correspondence and/or financial material were exchanged between each Defendant in the State in which each is located, incorporated, or has its principal place of business and other States;

(c)     Money flowed between banks outside of the State in which each Defendant is located, incorporated, or has its principal place of business and other States; and/or

(d)     Defendants and their co-conspirators imported substantial quantities of raw materials for shelf-stable tuna from outside the United States.

54.     The effect of Defendants' and their co-conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiff's claims.

## VI.     THE PRODUCTION OF SHELF-STABLE TUNA

55.     There are several stages in the production of shelf-stable tuna. Initially, the tuna is caught by fishing vessels, which operate in the Pacific, Atlantic, and Indian Oceans (although the majority of tuna comes from the Pacific Ocean). After it is caught, the fish is frozen or refrigerated. Both Dongwon and TUG control extensive tuna fishing fleets used, at least in part, to supply fish to StarKist and COSI, respectively.

56.     In addition to the fleets controlled by Dongwon and TUG, tuna trading companies buy the fish from fishing vessels and coordinate transshipment of catches to processors, including Defendants. During the period relevant to Plaintiff's claims, the major trading companies were: the Tri-Marine Group, a foreign organization that does business in the United States through Tri-Marine International, Inc., Tri-Marine Management Company, LLC, Tri Marine Fishing Management LLC, Tri Marine Fish Company, and The Tuna Store, LLC; Itochu Corporation, a Japanese company in the fishing business through its Food Company, which it owns and controls; and Fong Cherng Fishery Company Ltd. ("FCF"), a privately-held Taiwanese company.

31

57.     After fish trading companies buy the fish or Dongwon-controlled or TUG-controlled vessels catch the tuna, they arrange its delivery to a processing plant where it is cooked (usually by steaming), cleaned, filleted, and prepared for canning or packaging. For example, Bumble Bee describes the process for tuna as follows:

> Upon arrival to the local processing plant, the whole frozen tuna rounds are put into cold storage. The rounds are first inspected for quality, then grouped by size and weight for the most accurate thawing and cooking times. The processing begins when the tuna is removed from the plant freezer, thawed in water and prepared for cleaning. The tuna is then loaded into metal racks, which are wheeled into large steam pre-cookers. Tuna is cooked for a prescribed time and temperature depending upon the size of the fish. Once the tuna is cooled, the tuna meat is removed from the bones. The tuna loins are placed in bags, blast frozen to lock in moisture and placed on pallets for shipment to canneries in the United States. The frozen loins are shipped directly to the cannery where the canning process is entirely automated. The tuna move in a single line from the filling machine to the packaging sealer. The sealed product is then cooked, cooled, and labeled. Once they pass Quality Assurance approval, the cans are prepared for shipment to your local market.[7]

58.     After processing, the tuna is canned or packaged. Chunk-style tuna is conveyed through a chopper, while solid-style tuna is packed directly into the can. Along with the tuna, the container is typically filled with varying types of liquid (usually vegetable oil or water) before it is sealed. After being sealed, it is cooked under pressure to allow for sterility and a long shelf-life. The tuna cans and pouches are then sold. Prices paid for shelf-stable tuna may vary depending upon several factors, including the type of tuna (*e.g.*, light or white meat), packaging (can or pouch), water or oil, flavoring, brand, and package size.

59.     The StarKist Defendants maintain facilities in South Korea, Thailand, Ecuador, and American Samoa. The COSI Defendants maintain facilities in Thailand and Lyons, Georgia. Bumble Bee conducts the majority of its canning operations in the United States, at its

---

[7] *See* http://www.BumbleBee.com/tracemycatch/results.

production facility near San Diego. Bumble Bee also buys light meat loins from traders in the Western/Central Pacific Ocean (*e.g.*, Papua New Guinea), the Indian Ocean (*e.g.*, Thailand) and the Eastern Pacific Ocean (*e.g.*, Ecuador), and the product is shipped to its California cannery for canning and sale in the United States.

## VII.    TUNA SUPPLY, DEMAND AND PRICING

### A.    The Supply of Canning-Grade Tuna Increased Substantially

60.    The higher prices witnessed during the conspiracy did not stem from global reductions in the supply of harvested tuna or other fish. To the contrary, technological advances in fishing over the last 40 years, due mostly to the advent of the purse seine for tuna fishing (a method of fishing involving the use of large nets that capture entire schools of fish), and the use of Fishing Aggregation Devices or FADs (man-made objects such as floats or buoys that are used to attract certain fish), have increased the volume of skipjack and albacore caught annually, as reflected in the following chart:



61.     The advances in fishing technology have increased the efficiency of fishing and substantially lowered the cost necessary to fish for tuna on a commercial scale. According to the Pacific Islands Forum Fisheries Agency ("FFA"), between 1986 and 2007, the average catch per tuna fishing vessel roughly doubled, from 3,750 metric tons to 7,100 metric tons per year. This, in turn, spurred investment in fishing vessels. Between approximately 2007 and 2011, the number of tuna fishing vessels increased by more than 25%.

62.     The combination of increased investment in fishing vessels and improved efficiency of those vessels has resulted in a dramatic increase in the volume of canning-grade tuna caught annually. As the following chart depicts, between 1984 and 2014, the volume of skipjack caught annually increased roughly three-fold:



B.      **The Demand for Shelf-Stable Tuna in the United States Decreased Substantially**

63.     The higher prices for shelf-stable tuna during the conspiracy did not result from increasing demand for the product. To the contrary, there has been a decline in both the demand for and consumption of shelf-stable tuna in the United States over the last 25 years. As publicly available information reflects, consumption of canned tuna in the United States peaked at nearly

four pounds per person in the early 1990s, and then began to fall, to 3.4 pounds per capita in 2003 and to approximately 2.5 pounds per capita in 2009, with consumption and demand continuing to decline thereafter. The following chart, based on publicly available information, depicts the declining per capita consumption of canned tuna in the United States:



64.     Demand for shelf-stable tuna in other developed countries has also declined per capita. In Japan, consumption of canned tuna declined by approximately 20% from 1995 to 2007, while overall consumption in Western Europe remained stagnant between 2000 and 2010. Notwithstanding this trend of declining demand, the United States, Western Europe and Japan accounted for more than 50% of all global canned tuna consumption in 2008 according to the FFA. Further, the United States remained the largest consumer of canned tuna in the world, accounting for approximately 28% of global consumption in 2010.

**C.      Prices Paid for Shelf-Stable Tuna Increased Substantially as a Result of Defendants' Conspiracy**

65.     In the face of declining U.S. demand for shelf-stable tuna and the increasing supply of canning-grade tuna and other species of fish, market forces should have put substantial

pressure on Defendants to pursue greater market share by lower prices. Instead, because of the conspiracy, the opposite occurred.

66.     As discussed above, the higher prices paid by Plaintiff were due to the conspiracy and not other factors. During the conspiracy (and because of it), shelf-stable tuna prices sold to U.S. retailers, including Plaintiff, increased (or were otherwise above competitive levels) while the tuna catch increased and U.S. demand for shelf-stable tuna declined. This incongruity is also reflected in the chart below, which shows that although per capita U.S. canned tuna consumption continued to decline after approximately 2004, the dollar amount spent on canned tuna and other packaged seafood in the United States actually increased (canned tuna accounts for approximately 75% of all canned seafood spending):




**Americans are buying less, but more expensive canned seafood**
■ Volume sales ■ Dollar sales

Made with Chartbuilder                                         Data: Euromonitor

67.     Defendants and their co-conspirators' pricing of shelf-stable tuna sold to Plaintiff and others in the United States is inconsistent with expected pricing given the excess supply and production capacity coupled with declining U.S. demand. To the contrary, during the conspiracy, the prevailing market conditions in the U.S. shelf-stable tuna industry would predict *decreasing*

prices. But as alleged in this Complaint, shelf-stable tuna prices—including the prices Defendants and their co-conspirators charged Plaintiff—were higher than they would have been absent the conspiracy.

68.     The higher shelf-stable tuna prices resulted in substantial profits for Defendants. TUG saw its net profit increase from $61 million in 2008 to $140 million in 2014. The following year, in its 2014 Annual Report issued in February 2015, TUG explained that "[d]espite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped lift the margin of our US brand."

69.     A substantial portion of TUG's profits were the result of the conspiratorial agreements alleged in this Complaint. ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████

70.     Bumble Bee has also profited from the conspiracy. Lion Capital purchased Bumble Bee for $980 million in 2010, and reached an agreement to sell it to TUG in 2014 for $1.51 billion. In announcing the sale, Lion Capital noted that Bumble Bee's EBITDA in 2014 was a record-breaking $150 million, on revenue of $1 billion. Kelly Mayer, in a memo to her partners at Lion Capital, attributed Bumble Bee's record year to the growth of "gross margins through disciplined pricing actions."[8]

71.     StarKist, which has the largest U.S. market share, ████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

---

[8]   *See*   https://www.undercurrentnews.com/2014/12/22/lion-capital-to-morethan-quadruple-its-investment-in-bumble-bee/.

Accordingly, Dongwon registered substantial additional income in the period following the collusion alleged in this Complaint, and received the proceeds of the conspiracy from StarKist knowing the ill-gotten nature of these funds. ████████████████████ ████████████████████

72.     In a Korean-language publication, Dongwon stated that "[t]he canned tuna market in the U.S. is approximately a $1,700,000,000 USD market, but it is a mature market where growth has stopped, and it maintains an oligopolistic system with StarKist (40%), Bumble Bee (25%), and COSI (15%), and represents a structure in which the price of tuna cannot be efficiently reflected in the sales price of products." Instead, during time periods relevant to these allegations, the price of shelf-stable tuna reflected the supracompetitive conspiracy price.

**D.      Defendants' Pricing of Shelf-Stable Tuna to Plaintiff and Others Was Against Defendants' Self-Interest But For Their Collusion**

73.     As explained above, during the conspiracy, the vast majority of the market for the production and sale of shelf-stable tuna in the United States was concentrated among a few firms: the Defendants in this case (Bumble Bee, the COSI Defendants and the StarKist Defendants). However, none of these companies had the power, unilaterally, to profitably increase the price of shelf-stable tuna sold in the United States. Instead they needed to maintain a unified front in order to increase prices to the highly profitable levels that existed during the conspiracy. Because Defendants' shelf-stable tuna products were close substitutes, unilateral attempts by any one of them to manipulate shelf-stable tuna price or supply posed substantial commercial risks. A increase in price not followed by others would simply lead to lost sales. A unilateral reduction in production would be costly because market share would be lost and revenue would likely fall while fixed costs (*e.g.*, labor, distribution, overhead, facility operation, facility maintenance, etc.) would remain relatively the same. Under the circumstances,

Defendants and their co-conspirators' shelf-stable tuna pricing actions during the conspiracy would have been against their self-interest unless they were colluding.

## VIII.   THE MARKET FOR THE PRODUCTION AND SALE OF SHELF-STABLE TUNA WAS CONDUCIVE TO CARTELIZATION

### A.   There Are No Close Substitutes for Shelf-Stable Tuna

74.      Shelf-stable tuna includes both "white" tuna fish, which consists of albacore tuna, and "light" tuna fish, which consists primarily of skipjack tuna. Both varieties of shelf-stable tuna are typically packed in either water or vegetable oil. Light tuna accounts for approximately two thirds of total sales in the United States by volume.

75.      Shelf-stable tuna possess commodity-like characteristics in that the product of one seller is interchangeable with the product of another. It would not be profitable for Defendants and co-conspirators to unilaterally increase shelf-stable tuna prices in the U.S., because a unilateral price by any Defendant would allow another Defendant to steal substantial market share by simply holding its price.

### B.   The Market for the Processing and Sale of Shelf-Stable Tuna Is/Was Concentrated

76.      Over the past two decades, the shelf-stable tuna industry has undergone significant consolidation. As a result of this consolidation, and during the conspiracy, the U.S. shelf-stable tuna industry had become highly concentrated.

77.      During the conspiracy, the market for the production of shelf-stable tuna was dominated by Defendants and their co-conspirators. Because of the conspiracy alleged in this Complaint, Defendants and their co-conspirators illegally restrained trade in the market for the sale of shelf-table tuna. Although estimates of their respective market shares vary somewhat, StarKist, Bumble Bee and COSI's branded products account for approximately 80% of the canned tuna market in the United States. Also, COSI, which has the smallest domestic market

share of the three Defendants for branded canned tuna, is the largest supplier of private-label canned tuna in the United States. The conspiracy affected the pricing of private label tuna. During the conspiracy, Defendants processed at least 85% of all canned tuna sold in the United States.

**C.     Barriers to Entry**

78.     During the period relevant to Plaintiff's claims, there were barriers to entry into the market for the production and sale of shelf-stable tuna in the United States, including:

(a)     New entrants were faced with substantial startup costs, including the need to gain access to distribution channels and retail outlets. Additionally, substantial manufacturing expertise was required to enter the U.S. market. These startup costs reduced the opportunity or ability for rivals to enter the U.S. market and undercut Defendants and their conspirators' supracompetitive pricing.

(b)     New entrants and existing market participants faced substantial upfront, industry-specific costs to build a plant to process tuna loins into shelf-stable tuna. For example, the cost for Tri-Marine simply to modernize the plant it acquired from COSI in Pago Pago, American Samoa, in 2010, was approximately $70 million. (The plant did not reopen until approximately 2015.)

(c)     The method used for processing shelf-stable tuna in the United States was capital intensive. Given the cost to Tri-Marine of modernizing COSI's Pago Pago plant, the purchase of real estate and the construction of a new shelf-stable tuna processing facility in the mainland United States would likely cost in excess of $70 million, and require substantial industry expertise to build and operate.

(d)     Restrictive tariffs of between approximately 6% and 35% on the importation of canned tuna into the United States impaired the ability of foreign suppliers to capitalize on supracompetitive domestic pricing of shelf-stable tuna.

**D.     Prevailing Supply and Demand Factors Incentivized Collusion**

79.     As discussed above, during the conspiracy, Defendants and their co-conspirators faced supply and demand factors that should have led to lower prices for shelf-stable tuna in the United States. The declining consumption of shelf-stable tuna in the United States resulted in excess production capacity for shelf-stable tuna. Defendants and co-conspirators had sufficient production capacity in the United States to supply consumers with 3.4 pounds of canned tuna per capita in 2003. But by 2009, when annual per capita consumption had fallen to 2.5 pounds, a large portion of Defendants and their co-conspirators' capacity went unused.

80.     On top of the excess production capacity standing idle because of declining demand, Defendants also took steps before 2009 to increase their own efficiency and production capacity of shelf-stable tuna. For example, COSI's Lyons, Georgia plant—which opened in 2009—had a production capacity that was approximately 50% higher than the production capacity of the Pago Pago plant that it displaced (and that was reopened by Tri-Marine in 2015). And when Dongwon purchased StarKist in 2008, it transferred equipment and technology that increased the manufacturing capacity of the StarKist Defendants' plant in Pago Pago.

(a)     Accordingly, the expanding global supply of canning-grade tuna coupled with declining demand for shelf-stable seafood and the excess domestic production capacity controlled by Defendants left the shelf-stable tuna industry ripe for collusion.

**E.     The Movement of Executives Between Defendants Facilitated Collusion**

81.     During the conspiracy alleged in this Complaint, executives left one conspirator to take a position at another.

41

82.    For example, Don George, Bruce Bollmer, and Herbert Tucker all worked at COSI when the conspiracy began in 2004, and later took positions at Bumble Bee (George) and StarKist (Tucker and Bollmer). Joe Clancy was a former StarKist employee who joined COSI in 2002 and, as alleged below, continued to exchange confidential information with former colleagues after joining COSI. Similarly, Jan Tharp left StarKist and joined Bumble Bee in a senior role, and maintained a close relationship with several StarKist executives after joining Bumble Bee.

83.    Additionally, there were a number of close personal relationships between key members of the conspiracy. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

84.    Due to these close relationships, senior executives at each of the conspirators spoke or texted with their counterparts from other Defendants on a frequent basis, providing opportunities and incentives for the collusive conduct alleged.

F.    **Select Trade Associations Facilitated Collusion**

85.    The culture of collusion that existed in the packaged seafood industry during the period relevant to Plaintiff's claim was also facilitated and enhanced by certain trade associations that counted Defendants among their major, or only, members. One such trade association was the National Fisheries Institute ("NFI"), which existed as early as 2004. Defendants Bumble Bee, COSI and Del Monte/StarKist were among its members. In 2007, NFI created the Tuna Council, whose only members were Bumble Bee, COS and Del Monte/StarKist. As soon as the Tuna

Council was created, Defendants used it to facilitate their collusion. For example, in January

2008, as Defendants were discussing their collusive can-size reduction, ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ As Plaintiff alleges in further detail below,

Defendants discussed and exchanged confidential information about shelf-stable tuna pricing in

furtherance of the conspiracy under the cover of NFI and the Tuna Council.

### G.   Common Vendors and Co-Packing Arrangements Facilitated Collusions and Enforcement of the Cartel

86.      During the period relevant to Plaintiff's claims, but particularly between

approximately 2004 and 2010, Defendants shared a common canner in American Samoa,

Impress. Bumble Bee, Del Monte/StarKist and COSI each knew at the time that Impress was

sharing production and other information about each of them with the others, and Defendants

used Impress as a conduit to facilitate the exchange of information regarding the conspiracy. As

alleged in this Complaint, Impress is a co-conspirator, and its role in this regard is illustrated in

connection with the collusive can size reduction that occurred in 2007 and 2008.

87.      In addition to economic and other conditions that facilitated the conspiracy, in

2011, Bumble Bee and the COSI Defendants entered into co-packing agreements in which

Bumble Bee's factory in Santa Fe Springs, California, packed and canned the tuna for COSI's

west coast operations, and COSI's plant in Lyons, Georgia, packed the shelf-stable tuna for

Bumble Bee's east coast operations. This co-packing arrangement enabled Bumble Bee and the

COSI Defendants to monitor each other's output and pricing.

43

### IX.   ADDITIONAL OVERT ACTS IN DEFENDANTS' SHELF-STABLE TUNA CONSPIRACY

88.     Defendants and their co-conspirators carried out their continuing conspiracy regarding shelf-stable tuna through in-person meetings and communications, including emails and telephone calls. During these meetings and communications, they agreed on conspiracy terms as alleged in this Complaint, and coordinated price increase announcements or pricing terms, secretly and collusively exchanged pricing information and prospective pricing announcements and business plans, and collectively reduced quantity and restrained output of shelf-stable tuna sold to Plaintiff and others in the United States.

### A.   Defendants' Collusive Price Increases Between 2004-2006

89.     In the first half of 2004, the prevailing prices for shelf-stable tuna in the United States were below the level needed to deliver the profits expected by TUG. Between 2001 and 2003, shelf-stable tuna prices had declined, as had profit margins. ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ TUG favored this strategy because higher shelf-stable tuna prices accommodated higher prices for processed tuna sold by TUG to COSI and its rivals. (Processed tuna is the main cost input to produce shelf-stable tuna).

90.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

91.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

92.    ████████████████████████████████████

████████████████████████████████████ a conscious

commitment to an unlawful common scheme, *i.e.*, an agreement, developed among Defendants

and co-conspirators to increase prices of shelf-stable tuna sold to Plaintiff and others in the U.S.

by, among other conduct, ██████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

45

93. 

94.

95.

96.



97.

98.



99.

100.

101.

102.

103.



104.

105.

106.

107.

108.



109.

110.

111. ████████████████████████████████████████

112. ████████████████████████████████████████

**B.**   **Defendants' Collusive Can Size Reduction and Price Increases in 2007-2008**

113.   The conspiracy among Defendants and co-conspirators continued in 2007 and 2008.

114.   ████████████████████████████████████████



115. ██████████████████████████████████████████

116. ██████████████████████████████████████████

117. ██████████████████████████████████████████

██████████████████████████████████████████████████████████

███████

118.    The collusive can-size reduction was facilitated by co-conspirator Impress, a canner with facilities in American Samoa. In 2007-08, Impress had a commercial relationship with Del Monte/StarKist, Bumble Bee and COSI. ████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

119.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

120.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████

121.    ████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████

122.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

123.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

124.    Defendants also agreed to coordinate their messaging regarding their plans to downsize cans, so that customers would not learn that the decision was not driven by necessity, but was instead the result of collusion. ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████



125.

126.

127. 

128.

129.   The conspiracy among Defendants and co-conspirators continued after the agreement to reduce the tuna can size.

130.

131.



132. ████████████████████████████████████

133.

134.

135.

**C.**      **Defendants Collude on Net Prices in 2010**

136.      The conspiracy among Defendants and co-conspirators continued into 2010, when they once again collusively raised net prices on shelf-stable tuna. Net prices are the prices disseminated to brokers of shelf stable seafood products, and represent the list price, less promotional allowances offered by Defendants to reduce the list price. (Brokers present these prices to retailers like Plaintiff, who pay Defendants directly for the product). This collusive price increase was announced by each Defendant ███████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

137.      ███████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

138.      ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

139.      ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



140.

141.

142.

███████████████████████████████████████████████

████████████████████████████

143.   ████████████████████████████████████████

███████████████████████████████████████████████

███████████

144.   ████████████████████████████████████████

██████████████████████████████████

**D.**   **Defendants Colluded to Increase Shelf-Stable Tuna Prices in 2011**

145.   Even with the alteration in can size for processed tuna and the prior collusive price increases, Defendants and co-conspirators were still unhappy with shelf-stable tuna prices. ███████████████████████████████████████████████

███████████████████████████████████████████ Unable to achieve this through lawful measures, Defendants continued to meet, communicate, and conspire regarding the sale of shelf-stable tuna sold in the United States.

146.   ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

60



147.

148.

149.

150.

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████

**E.**     **Defendants Colluded on a Shelf-Stable Tuna Price Increase in 2012**

151.    The conspiracy among Defendants and their co-conspirators continued after 2011

and into 2012. ██████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████

152.    In December 2011 and January 2012, telephone conversations occurred between

senior executives and sales personnel of Bumble Bee, the COSI Defendants and the StarKist

Defendants about coordinating and announcing a price increase for a number of products in the

second quarter of 2012.

153.    ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

154.   These discussions led to an agreement or understanding that the Defendants would increase prices by nearly identical amounts. Pursuant to this agreement or understanding, the Defendants announced collusive price increases as follows: ███████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████

155.   ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

### F.   Defendants' Collusion Not to Sell "FAD-free" Branded Tuna Products in 2011 and Thereafter

156.   In 2011, employees and representatives of the StarKist Defendants, Bumble Bee, and the COSI Defendants discussed whether any of them would launch a "FAD-free" product. These discussions included emails that occurred throughout 2011 and into 2012.

157.   ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████

158.   ██████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

159.    Defendants came to believe that if any of them launched a FAD-free product under one of their own branded labels, then it would work to the detriment of each of their companies. ███████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████

160.    On a teleconference during the week of February 10, 2012, the StarKist Defendants, Bumble Bee and the COSI Defendants agreed that none of them would launch a branded FAD-free canned tuna product in the United States. This agreement was later confirmed in writing during the week of February 17, 2012. Defendants agreed not to sell FAD-free canned tuna products in the United States under their own brand names to avoid competition in the sale of canned tuna in the United States. ███████████████████████████

███████████████████████████████████████████████████

161.    ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

162.    ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████

**G.     Defendants Colluded on Promotional Activity and Pricing Terms in at Least 2011-2013**

163.    Between at least November 2011 and June 2013, senior executives and sales personnel of the StarKist Defendants, Bumble Bee, and the COSI Defendants exchanged emails and had telephone conversations about discounting and promotional practices and terms for the sale of canned tuna to customers. As part of these emails and telephone conversations, these senior executives and sales personnel of Defendants assured each other that they restrain trade with respect to the sale of shelf-stable tuna.

164.    ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████

165.    ████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

**H.     Defendants Communications' in Furtherance of the Conspiracy After 2013**

166.    Defendants' collusive activities regarding shelf-stable tuna continued after 2013.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



### I.  Defendants' Conspiracy Was Effective

167.  Defendants' and co-conspirators' conspiracy was effective. For example, Bumble Bee's Lischewski observed in 2012 that canned tuna prices had increased more than 40% in eighteen months during 2011 and 2012.

168.  As a proximate result of this conspiracy, and during the period relevant to Plaintiff's claims, Defendants and co-conspirators charged Plaintiff and others in the United States supracompetitive prices (*i.e.*, prices above a competitive level) for shelf-stable tuna.

169.  Defendants' and co-conspirators' conspiracy alleged in this Complaint overcharged Plaintiff on shelf-stable tuna that Plaintiff directly purchased from one or more Defendants and co-conspirators regardless of whether the conspiracy price increase was on Defendants' list or net price of shelf-stable tuna. This is because Plaintiff directly purchased shelf-stable tuna from Defendants and coconspirators, and Defendants and co-conspirators' collusive manipulation of shelf-stable tuna list and net prices had an adverse effect on the price Plaintiff paid for shelf-stable tuna.

170.  As alleged in this Complaint, during the conspiracy, Defendants and co-conspirators agreed on the timing and amount of shelf-stable tuna price increases as reflected in

price announcements. They were successful in achieving these price increases, which enabled them to impose supracompetitive prices on Plaintiff and others. This was because Defendants knew during the conspiracy that all of them were increasing shelf-stable tuna prices (or offering the same or similar prices); and the announced shelf-stable tuna price increases were higher than would have occurred if, in the absence of the conspiracy, each Defendant had competed and independently and unilaterally crafted its own price increase announcements. Defendants' coordinated shelf-stable tuna price increase announcements provided them with a higher, unified starting point for imposing shelf-stable tuna prices on Plaintiff and others than the increase (if any) that would have resulted if each Defendant had independently and unilaterally set its own price increases.

171.    Coordination over the pricing of shelf-stable tuna products affected pricing of both branded and private label shelf-stable tuna products, both cans and pouches.

## X.    DOJ INVESTIGATION AND AMNESTY APPLICATION

172.    In July 2015, published reports revealed that the United States Department of Justice ("DOJ") had convened a Grand Jury to investigate potential antitrust violations by companies in the market for the production, pricing and/or sale of packaged seafood, including shelf-stable tuna. DOJ has since publicly confirmed that it is investigating Defendants, explaining to the United States District Court for the Southern District of California that "it is conducting an ongoing criminal investigation of Defendants for "potential violations of the Sherman Act, 15 U.S.C. § 1, in the packaged seafood industry."

173.    An indication that something was afoot occurred on July 17, 2015, when TUG—which had previously announced an initial public offering ("IPO") to finance the acquisition of Bumble Bee—publicly stated that it was suspending the IPO. *See* http://www.nationmultimedia.com/business/TUF-suspends-preferential-publicoffering-over-US-

30265095.html. As alleged above, on December 3, 2015, TUG and Bumble Bee notified the DOJ that they would not proceed with the deal. Their decision to cancel the sale was due to their concerns regarding the antitrust investigation and potential liability to their customers for anticompetitive behavior. *See* https://www.law360.com/competition/articles/734219/bumble-bee-thai-co-drop-15b-tuna-tieup-over-doj-fears.

174.    DOJ's criminal investigation of Defendants has thus far resulted in four convictions for violations of the U.S. antitrust laws. As alleged earlier, two senior Bumble Bee executives—Cameron and K. Worsham—have pleaded guilty to criminal violations of the Sherman Act for their participation in the conspiracy with others to fix prices of packaged seafood between at least 2011 and 2013. Bumble Bee itself has pleaded guilty to an Information charging that Bumble Bee engaged in price-fixing shelf-stable tuna fish in the United States in violation of Section 1 of the Sherman Act and will pay a criminal fine of at least $25,000,000. And on June 28, 2017, Stephen L. Hodge, a former Senior Vice President of Sales at StarKist, pleaded guilty for his role in the conspiracy to fix the price of packaged seafood.

175.    By virtue of its seeking amnesty, COSI has also admitted to the DOJ that it engaged in criminal violations of the Sherman and Clayton Acts regarding the pricing of shelf-stable tuna.

176.    The StarKist Defendants are targets of the Grand Jury investigation, as reflected by the criminal prosecution and guilty plea of former StarKist executive Stephen Hodge. The StarKist Defendants are currently unindicted coconspirators whose conduct formed the basis, in part, for both Cameron's and K. Worsham's criminal price-fixing convictions.

177.    The DOJ's criminal investigation into the conduct alleged in this Complaint is ongoing. Following the announcement of K. Worsham's agreement to plead guilty, then-Acting

Assistant Attorney General Renata Hesse, head of the DOJ's Antitrust Division, commented: "We [DOJ] will continue our work to root out the collusion among packaged seafood companies . . . ." After announcing that Bumble Bee entered into a plea agreement, Acting Assistant Attorney General Attorney Andrew Finch stated that "the [Antitrust] division, along with our law enforcement colleagues, will continue to hold these companies and their executives accountable for conduct that targeted a staple in American households." Then, in announcing the Hodge plea agreement, Finch commented that DOJ's Antitrust Division, "along with our law enforcement colleagues, will continue to investigate price fixing among packaged seafood companies and the executives who worked at those companies."

## XI.   DISCOVERY IS NECESSARY TO DETERMINE THE FULL SCOPE OF THE CONSPIRACY

178.   Discovery is necessary to determine the full scope of the conspiracy, including the time frame, products and participants. Plaintiff reserves the right to amend or supplement this Complaint to add other Defendants, claims, time period, products or other allegations based upon discovery and further investigation.

## XII.   TOLLING/SUSPENSION OF THE STATUTE OF LIMITATIONS

179.   The statutes of limitation as to Defendants and their co-conspirators' continuing antitrust violations alleged in this Complaint were tolled because of one or more of the following events:

(a)   The pendency of one or more Class Action Complaints, and any Amendments, against Defendants and their co-conspirators for conspiring to fix prices of shelf-stable tuna tolled the running of the statute of limitations on Plaintiff's claims; and/or

(b)   The pendency of the DOJ's criminal investigation, including the December 7, 2016, Criminal Complaint (or Information) filed by DOJ charging Cameron with

the criminal offense of violating the U.S. antitrust laws by participating in a conspiracy to fix, stabilize, maintain, and/or raise the prices of packaged seafood sold in the United States. The DOJ's investigation, including the filing of the Cameron criminal proceedings and the filing of others that followed regarding t shelf-stable tuna conspiracy, suspended the running of the statutes of limitation on Plaintiff's claims during the criminal proceedings and for one year thereafter by operation of federal statute, under 15 U.S.C. § 16(i).

        (c)     Defendants' affirmative acts of fraudulent concealment of the conspiracy prevented Plaintiff from having notice of their claims more than four years before filing their initial Complaint, and tolled the statute of limitations on Plaintiff's claims.

    180.    Each of the overt acts in furtherance of the conspiracy alleged in this Complaint was done with the purpose of concealing the conspiracy and preventing Plaintiff and other purchasers of shelf-stable tuna from learning about the conspiracy's existence. Accordingly, Plaintiff did not know or reasonably suspect the existence of their claims more than four years before filing their initial Complaint, nor were they aware of any facts more than four years before filing their initial Complaint that would have put them on reasonable notice of their claims. More than four years before Plaintiff filed its initial Complaint, Defendants and their co-conspirators fraudulently concealed the existence of Plaintiff's antitrust claim so that Plaintiff, acting as a reasonable person, did not know of the existence of its claim at the time.

    181.    During the period relevant to Plaintiff's claims, including the time period more than four years before Plaintiff filed its initial Complaint, Defendants and their co-conspirators concealed the existence of Plaintiff's antitrust claims from Plaintiff as a result of the self-concealing nature of the conspiracy; and/or because Defendants and their co-conspirators engaged in affirmative and deceptive acts of concealment as described below. As a result,

Plaintiff did not know, and through the exercise of due diligence (which it exercised) could not have known, about the existence of its antitrust claims more than four years before filing its initial Complaint.

182.    In addition to the self-concealing nature of their conspiracy, during the period relevant to Plaintiff's claims, including more than four years before Plaintiff filed its initial Complaint, Defendants and their co-conspirators affirmatively misled Plaintiff by wrongfully and affirmatively concealing the existence of Plaintiff's antitrust claims from Plaintiff. In addition to the overt acts alleged above that were undertaken with the purpose of concealing the conspiracy, Defendants took additional steps to conceal their illegal conduct from Plaintiff and others. For example:

(a)    During the conspiracy alleged in this Complaint, and as alleged above, Defendants and co-conspirators met in secret to affirmatively conceal the existence of the conspiracy from those not involved in it.

(b)    During the conspiracy alleged in this Complaint, Defendants and co-conspirators used personal email for conspiracy communications in order to avoid detection of the conspiracy by those not involved in it. (Defendants did not typically use private email accounts for any other business purposes and instead used their corporate email accounts). █

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████



(c)     During the conspiracy alleged in this Complaint, Defendants and co-conspirators used misleading subject lines on emails to affirmatively conceal the conspiratorial nature of their communications from those not involved in the conspiracy. ███████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

(d)     During the conspiracy alleged in this Complaint, Defendants and co-conspirators met in places outside their offices to communicate about the conspiracy in order to affirmatively conceal the fact of their meeting and the existence of the conspiracy from those not involved in it. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████

      (e)     During the conspiracy alleged in this Complaint, Defendants and co-conspirators applied warnings on documents not to disclose to others or instructions about transmission to affirmatively conceal the existence of the conspiracy from those not directly involved in it. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

(f)      During the conspiracy alleged in this Complaint, Defendants and co-conspirators affirmatively concealed the existence of the conspiracy from Plaintiff and others by providing pretextual explanations for Defendants and co-conspirators' collusive canned tuna can size reduction, price increases and other conspiracy activities. These explanations, while seemingly true on their face at the time, were actually intended by Defendants and co-conspirators to deflect attention from and conceal their conspiracy and to create the illusion of competition when, in fact, price competition was being systematically suppressed and eliminated. As such, these explanations were false and pretextual. For example:



(iv)





(v)

(vi)    Defendants and their co-conspirators cited their own predictions about where the tuna market was heading as the basis for a price increase. Because these future predictions were unverifiable by Plaintiff and other customers, they provided Defendants with pretexts that allowed for the implementation of collusive price increases. For example, on January 18, 2012, the COSI Defendants wrote to their customers that "[h]igh fish prices have made it necessary to increase the list price of both light and white [tuna]. All indicators are that these higher raw material costs will not return to levels that were seen as recently as a year ago." Upon information and belief, this pretextual explanation was discussed between

77

or among Defendants through email and telephone communications in the weeks and months that preceded COSI's announcement.

(vii)    In a letter to customers dated March 30, 2012, Bumble Bee's Cameron predicted that a number of "unforecasted elements," some of which would occur "in the second half of 2012," combined to require Bumble Bee to increase its own pricing.

(viii)    In a March 30, 2012, interview, IS Cho explained the justification the StarKist Defendants were giving to retailers in pretextual support of the collusive price increases: "We had a tough year last year and we have taken a lot of price increases . . . . We are fixing it and retailers do understand . . . . The tuna industry is not going to offer a low-priced and quality product and lose money on it."

(ix)    In a presentation to Kroger on April 19, 2013, Bumble Bee justified its shelf-stable tuna price increase by forecasting that the prices of skipjack and albacore would rise approximately $120 and $200 per metric ton, respectively, over the next six months.

(x)    Between 2011 and 2013, Defendants repeatedly gave pretextual justifications to the Plaintiff and others about their supposed inability to offer certain discounting or promotional terms. For example, in a presentation to Ahold in July 2013, the StarKist Defendants stated: "we will aggressively manage costs and improve productivity to maintain competitive pricing aligned with market conditions."

(xi)     Each of the foregoing examples of Defendants' explanations for shelf-stable tuna price increases was pretextual and false or misleading, as each price increase was the result of the conspiracy. The foregoing examples are representative of the pretextual and false or misleading explanations that Defendants and their co-conspirators provided to Plaintiff and others during the conspiracy, including more than four years before Plaintiff filed its initial Complaint, in order to affirmatively conceal the conspiracy from Plaintiff and others.

(g)     During the conspiracy alleged in this Complaint, Defendants and co-conspirators affirmatively concealed the existence of the conspiracy from Plaintiff and others by using trade association meetings, which they attended, to create the illusion that they were meeting for legitimate purposes when, in fact, they were using these meetings as a cover to conceal the conspiracy from outsiders. These trade associations include the Tuna Council and the ISSF. For example, in 2010, 2011 and 2012, Defendants, through the Tuna Council, partnered with the Thai Food Processors Association—of which TUG was a member—to plan and then launch a U.S. advertising campaign called "Tuna the Wonderfish," ostensibly to stimulate demand for shelf-stable tuna in the United States. ██████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

(h)     During the conspiracy, Defendants and co-conspirators affirmatively concealed the existence of the conspiracy from those not involved in it by confining knowledge and communication in furtherance of the conspiracy to a limited number of high ranking and/or key employees of each Defendant and co-conspirator, and limiting the creation of documents reflecting the existence of the conspiracy. ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████

183.    During the conspiracy, including more than four years before Plaintiff filed its initial Complaint, Defendants and their co-conspirators' affirmative acts of concealment were intended by them to conceal the existence of their unlawful actions from Plaintiff. Plaintiff was unaware, and had no reasonable basis to be aware, of Defendants and their co-conspirators' acts of concealment.

184.    As a direct result of Defendants and their co-conspirators' affirmative and fraudulent acts of concealment alleged above, Plaintiff did not have actual or constructive knowledge of its antitrust claim, or the facts that might reasonably have led any plaintiff (or a

reasonable purchaser in Plaintiff's position) to discover or suspect that it had the antitrust claim against Defendants and their co-conspirators alleged in this Complaint, more than four years before Plaintiff filed its initial Complaint.

185.    Further, throughout the conspiracy, Plaintiff engaged in due diligence in seeking to ensure that it was receiving competitive pricing for shelf-stable tuna. For example, Plaintiff used a method of purchasing shelf-stable tuna—including, for example, seeking price quotes and bids from their suppliers and/or investigating reasonably available public information—that caused it to believe in good faith at the time that it was receiving competitive prices for the shelf-stable tuna that it purchased from Defendants and their coconspirators. As alleged in this Complaint, as a proximate result of the conspiracy, Defendants and their coconspirators overcharged Plaintiff for shelf-stable tuna during time periods relevant to its claim despite its due diligence during the alleged conspiracy, including the time period more than four years before the direct purchaser class action litigations regarding this conspiracy were first filed.

186.    Defendants and their co-conspirators' fraudulent concealment of their unlawful conduct tolled the statute of limitations for Plaintiff's claim.

187.    Plaintiff's claims have been brought within the applicable statute of limitations period.

## XIII.   ANTITRUST VIOLATIONS

188.    Plaintiff incorporates by reference all of the preceding paragraphs above.

189.    Beginning at a time yet to be determined, but no later than 2004 with respect to all Defendants other than Dongwon, and no later than 2008 with respect to Dongwon, and continuing in force or effect, or both, until at least approximately July 2015, Defendants and their co-conspirators engaged in a continuing agreement, understanding and conspiracy to fix,

stabilize, maintain, and/or raise prices for shelf-stable tuna in the United States in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

190.     The contract, combination and conspiracy among Defendants and their co-conspirators described in the immediately preceding paragraph consisted of a continuing course, pattern and practice of conduct regarding the production, pricing, marketing, and/or sale of shelf-stable tuna in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

191.     The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following:

(a)     To fix, stabilize, maintain, and/or raise prices of shelf-stable tuna sold to Plaintiff and others in the United States;

(b)     To restrict the production and/or output of shelf-stable tuna sold in the United States; and/or

(c)     To impose supracompetitive prices  for shelf-stable tuna sold to Plaintiff and others in the United States resulting from Defendants' collusion.

192.     In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts (including those overt acts alleged above in this Complaint):

(a)     They agreed to exchange, and did exchange, current and future price information about shelf-stable tuna sold in the United States, including the prices quoted or charged to Plaintiff for the sale of shelf-stable tuna;

(b)     They agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for sale of shelf-stable tuna sold in the United States; and/or

(c)     They agreed on prices, price levels, and/or production levels of shelf-stable tuna sold in the United States.

193.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things: the overt acts described above, including, without limitation, participating in conversations and meetings to discuss the prices of shelf-stable tuna to be sold to Plaintiff and others in the United States; participating in conversations and attending meetings concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in accordance with the conspiracy; and/or exchanging confidential information on the pricing and/or sale of shelf-stable tuna to Plaintiff and others in the United States.

194.    As a result of Defendants' and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the period relevant to Plaintiff's claims.

(a)     Price competition in the sale of shelf-stable tuna among Defendants and their co-conspirators to Plaintiff and others in the United States has been restrained, suppressed or eliminated;

(b)     Prices for shelf-stable tuna sold by Defendants and their coconspirators to Plaintiff and others have been fixed, stabilized, maintained, and/or raised at artificially high and supracompetitive levels throughout the United States; and

(c)     Plaintiff and other direct purchasers of shelf-stable tuna have been deprived of the benefit of free and open competition.

195. Plaintiff has been injured in its business or property by reason of Defendants and their co-conspirators' antitrust violations in amounts not yet ascertained. Plaintiff's injury as a direct purchaser of shelf-stable tuna is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

**XIV.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

A.    A jury verdict in the amount of the compensatory damages sustained by Plaintiff.

B.    A judgment against Defendants, jointly and severally, by the Court in treble the amount of the jury verdict, in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, and for attorney's fees, costs and interest as allowable by law.

C.    Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted,

Dated: January 19, 2018                    _____/s/ Scott E. Gant_____

Scott E. Gant (proposed attorney-in-charge)
Kyle Smith (of counsel)
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, NW
Washington, DC 20005
Tel:  (202) 237-2727
Fax: (201) 237-6131
Email: sgant@bsfllp.com

*Attorneys for Plaintiff*

85

### Appendix A

█████████████████

| █████████ | ███████████ | ████████ |
|---|---|---|
| ███████ | █████ | ███████ |
| █████████ | █████████████ | |
| ███████ | █████████████ | ███████ |
| ████████ | ███████████████ | ██ |
| █████████ | ████████ | █████████ |
| ████████████ | █████████ | █████████ |
| █████████ | ██████ | █████████ |
| █████████ | ████████████████ | ███████████ |
| | | ██████████ |
| █████████ | ██████ | ████ |
| ██████████ | ████████████████ | ████████████ |
| ████████ | ████████ | ██████████████ |
| █████ | █████ | █████████ |
| ████████ | █████████████ | ████████████████ |
| | | ████████ |
| ███████ | █████████████ | █████████ |
| █████████ | ████████████████ | ██████ |

────────────────

[10] Only the highest known title attained by each individual at a given company is listed.